# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| WILFREDO BARRIOS, | ) | |
|                   Plaintiff, | ) | |
|   vs. | ) | No. 2:10-cv-243-WTL-WGH |
| | ) | |
| JULIE BEIGHLEY, | ) | |
|   Medical Administrator, et al., | ) | |
| | ) | |
|                   Defendants. | ) | |

**Entry Discussing Cross-Motion for Summary Judgment**

As used in this Entry, "Barrios" refers to plaintiff Wilfredo Barrios, "BOP" refers to the Federal Bureau of Prisons, "USP" refers to the United States Penitentiary at Terre Haute, Indiana, "URC" refers to the Utilization Review Committee at the USP.

For the reasons explained in this Entry, the defendants' cross-motion for summary judgment must be granted.

## Background

"Relief from misconduct by federal agents may be obtained either by a suit against the agent for a constitutional tort under the theory set forth in *Bivens v. Six Unknown Named Agents,* 403 U.S. 388 (1971), or by a suit against the United States under the Federal Tort Claims Act [FTCA] . . . which permits claims based upon misconduct which is tortious under state law. 28 U.S.C. §§ 1346(6), 2680." *Sisk v. United States,* 756 F.2d 497, 500 n.4 (7th Cir. 1985). Barrios' claim of constitutionally inadequate care is asserted pursuant to the *Bivens* route. The defendants are Julie Beighley and Thomas Webster, M.D.

As noted, the defendants have filed a cross-motion for summary judgment. (Barrios' motion for summary judgment was recently denied.)

The primary purpose of summary judgment is to isolate and dispose of factually unsupported claims." *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001). "As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1103 (7th Cir. 2008) (citations omitted).

A motion for summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is genuine only if a reasonable jury could find for the non-moving party. *Id.* If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris,* 127 S. Ct. 1769, 1776 (2007).

At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Harris*, 127 S. Ct. at 1776 (*quoting Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986) (footnote omitted).

The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Harney v. Speedway SuperAmerica, LLC,* 526 F.3d 1099, 1104 (7th Cir. 2008) (citing cases). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in this rule — set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2).

To support an assertion that a fact cannot be, or is genuinely disputed, a party must (a) cite to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials, (b) show that the materials cited do not establish the absence or presence of a genuine dispute, or (c) show that an adverse party cannot produce admissible evidence to support the fact. Fed.R.Civ.P. 56(c)(1)(A) and (B). If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion and grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it. Fed.R.Civ.P. 56(e).

## Applicable Law

In acting on a motion for summary judgment, "[t]he applicable substantive law will dictate which facts are material." *National Soffit & Escutcheons, Inc., v. Superior Systems, Inc.,* 98 F.3d 262, 265 (7th Cir. 1996). Barrios' claim is that the defendants violated his right to constitutionally adequate medical treatment by delaying surgery to treat a painful right heel bone spur. The substantive law applicable to the cross-motion for summary judgment is this:

- *Bivens* "authorizes the filing of constitutional tort suits against federal officers in much the same way that 42 U.S.C. § 1983 authorizes such suits against state officers . . . ." *King v. Federal Bureau of Prisons,* 415 F.3d 634, 636 (7th Cir. 2005). Thus, to maintain an action under 28 U.S.C. § 1331, the plaintiff "must allege a violation of the United States Constitution or a federal statute." *Goulding v. Feinglass,* 811 F.2d 1099, 1102 (7th Cir. 1987). Personal involvement must be shown. Because "vicarious liability is inapplicable to *Bivens* . . . suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009).

- Barrios' allegations relate to the conditions of his confinement at the USP. The pertinent constitutional claim is thus the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

- The Eighth Amendment requires the government "to provide medical care for those whom it is punishing by incarceration." *Snipes v. Detella,* 95 F.3d 586, 590 (7th Cir. 1996) (*cert. denied,* 519 U.S. 1126 (1997) (quoting *Estelle v. Gamble,* 429 U.S. 97, 103 (1976)).

- In medical cases, the Eighth Amendment test is expressed in terms of whether the defendant was deliberately indifferent to the plaintiff's serious medical needs. *Williams v. Liefer,* 491 F.3d 710, 714 (7th Cir. 2007). "Accordingly, a claim based on deficient medical care must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition." *Arnett v. Webster,* 658 F.3d 742, 750 (7th Cir. 2011). A medical condition need not be life threatening to qualify as "objectively serious"; it is enough "that a reasonable doctor or patient" would deem the condition "important and worthy of comment or treatment*." Hayes v. Snyder*, 546 F.3d 516, 523–24 (7th Cir. 2008) (quotation marks and citation omitted). Deliberate indifference exists only when an official "knows of and disregards an excessive risk to an inmate's health; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994) (construing *Estelle*).

- Not surprisingly, the Eighth Amendment standard operates differently in relation to physicians and to others.

- "A jury can infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Arnett v. Webster,* 658 F.3d 742, 750-51 (7th Cir. 2011) (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)). *"*A plaintiff can show

that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that 'no minimally competent professional would have so responded under those circumstances.'" *Id.* (quoting *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)). That the prisoner received some treatment does not foreclose his deliberate indifference claim if the treatment received was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

- In contrast: "[i]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor." *Spruill v. Gillis,* 372 F.3d 218, 236 (3d Cir. 2004); *see also Hayes,* 546 F.3d at 527 ("The policy supporting the presumption that non-medical officials are entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care is a sound one.").

Together with the foregoing, a court examines the totality of an inmate's medical care when determining whether prison officials have been deliberately indifferent to an inmate's serious medical needs. *Reed v. McBride,* 178 F.3d 849, 855 (7th Cir. 1999).

## Discussion

### Material Facts

The following statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Barrios as the non-moving party.[1] See *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

At the time pertinent to his claim, Barrios was an inmate at the USP.

At the time pertinent to Barrios' claim, J. Beighley was the Health Services Administrator at the USP.

---

[1] For clarity, although Barrios did not file a response to the defendants' cross-motion for summary judgment and his motion for summary judgment was previously denied, Barrios' affidavit (dkt 24-1 at pp. 23-29) was considered in determining the facts in the light most favorable to him as the non-moving party.

At a portion of the time pertinent to Barrios' claim, Thomas Webster, M.D., was the Clinical Director and a treating physician at the USP. Specifically, Dr. Webster filled those roles until his retirement on April 26, 2010,

The purpose of the URC is to review, among other issues, the following areas: outside treatment by medical contractors or consulting specialists, requests for outside specialist evaluations, and in-house or escorted trips to the specialist's office. BOP policy dictates that care which is considered "medically necessary - Acute or Emergent" does not require URC review prior to the treatment being provided. Prior to scheduling and conducting routine Health Care procedures, including non-emergent surgical procedures being performed on inmates at the expense of the BOP, the recommendation comes before the URC. The URC members provide the Committee subject matter appropriate input consistent with their area of expertise, *i.e.,* budget considerations, clinical considerations and medical indications, religious needs, notifications, scheduling, etc. The URC is chaired by the Clinical Director, who is the final authority on URC matters. J. Beighley, while eligible to serve on the URC, had no role in any URC matters related to Barrios.

Barrios received medical services from prison medical staff and outside medical consultants related to his complaints of foot and ankle pain, as well as other medical issues, throughout the period of time between May 2009, and January 2011, whenever he presented himself to the medical staff at sick call or regularly during "Callout" clinics.

J. Beighley was not involved in any clinical medical decisions related to the provision of medical care to Barrios.

On May 26, 2009, Barrios visited the USP medical clinic because his heels were hurting. His right heel in particular was in excruciating pain. Based upon Barrios' subjective complaints, an initial assessment and diagnosis of an Achilles bursitis or tendonitis was made and x-rays were ordered. Pain and anti-inflammatory medication (Indomethacin) was prescribed. Barrios was also instructed to purchase orthotics from the Commissary to ease the impact of the heel to the ground while walking or standing. Barrios never purchased any orthotics from the Commissary. Neither Beighley or Dr. Webster was involved in this medical contact.

On June 3, 2009, Barrios again visited the medical clinic because he was in pain. He was prescribed additional pain medication with an increase in dosage. Again, neither defendant was involved in that medical contact.

On June 14, 2009, x-rays were taken and were negative except for the presence of a right heel spur located on the posterior of the calcaneus. A supplemental radiology report noted that, in addition to the right bone spur on the posterior calcaneous, the x-ray showed "heterotopic ossification within the distal achilles tendon; atherosclerotic calcification." Once again, neither defendant was involved in this medical contact.

On July 13, 2009, Barrios visited the medical clinic because the pain he was experiencing had not abated. He was again prescribed pain and anti-inflammatory medication. Barrios was notified that based upon the x-rays and continued complaints, a referral to an Orthopedic specialist for examination was made.

On August 7, 2009, Barrios visited the medical clinic in unbearable pain. Barrios was told that the mid-level provider ("MLP") Jastillano requested a consultation with an orthopedist.

The URC approved the referral to an outside consultant.

On September 17, 2009, the Orthopedic consultant, Dr. Ulrich, examined Barrios and recommended that the bone spur could be excised by surgery. This examination and opinion were charted and reported by Nurse Bowman. Dr. Ulrich ordered that Ibuprofen 800 mg. be given to Barrios to control pain and inflammation three times a day for thirty days. See dkt. 34-3 at p. 20. Dr. Ulrich did not sign the chart or surgery recommendation. The recommendation for surgery was not a "medical emergency" and did not need to be implemented immediately.

On September 25, 2009, the URC deferred Dr. Ulrich's recommendation for surgery. No surgery was scheduled after Dr. Ulrich's recommendation because, the URC, in the absence of a signed order from Dr. Ulrich, deferred the surgery recommendation and requested that the Clinical Director, Dr. Webster, examine Barrios to verify the diagnosis and recommendation. The deferral was within BOP's URC policy. Beighley was not involved in the URC deferral or request for examination.

On September 29, 2009, Dr. Webster saw Barrios and performed the examination requested by the URC. During that visit Barrios verbalized that he felt pain "moving into his Achilles tendon." Barrios' Affidavit ("Pl. Aff.") ¶ 10[2] The September 29th examination indicated that there was an ongoing issue with the Achilles tendon that needed to be investigated before any surgery was ordered. Dr. Ulrich had not examined the Achilles tendon other than to note that it was intact on September 17, 2009. The June 14, 2009, x-rays noted a heterotropic ossification of the Achilles tendon. A bone spur on the posterior of the calcaneus would not result in pain moving into the Achilles tendon, and indicated that there was a problem with the Achilles tendon.

Barrios testified that Dr. Webster told him that surgery would not be approved

---

[2] When Dr. Webster asked Barrios about his ankle and foot pain, Dr. Webster testified that Barrios specifically pointed to an inflammation that appeared to be a ganglion cyst on his right heel slightly above the insertion of his Calcaneal (Achilles) tendon to the Calcaneus. Barrios testified that in response he pointed to his right heel. Where Barrios pointed is not material. What is material and clear from the record in evidence is that Dr. Webster reasonably believed Barrios had an undiagnosed issue related to his Achilles tendon that needed to be further investigated.

at this time because his pain did not coincide with the location of his heel spur and that nothing surgically could be done for his ganglion cyst. When Barrios asked about his bone spur, Dr. Webster told Barrios that he would live and that he didn't care about the orthopedic specialist recommendation for excision of the heel spurs.[3] Dr. Webster discontinued the prescription for Ibuprofen 800 mg and renewed a prescription for Indomethacin 50 mg to be taken three times a day for seven days.[4] Dr. Webster discontinued the Ibuprofen prescribed by Dr. Ulrich on September 29, 2009, because he substituted what in his medical judgment was a more effective medication for Barrios' pain and medication (Indomethacin), and the two drugs should not be taken at the same time.

Dr. Webster concluded that in his medical judgment surgical removal of Barrios' bone spur prior to completion of a full diagnostic evaluation of the Achilles tendon issue would have been premature and would not have been appropriate. Both Dr. Ulrich and Dr. Wilson testified that deferring the surgery while treating the bone spur conservatively until the Achilles was analyzed and diagnosed was appropriate.

An MRI of the right Calcaneus and right Achilles tendon was ordered so that the provisional diagnosis could be verified or confirmed. An MRI scan is the preferred test for diagnosing an Achilles tendon problem. Barrios was placed on the "Callout" list to allow his foot and ankle issues to be followed more closely while the Achilles issues were further defined.

It was appropriate for the heel spur surgery to be conservatively managed and treated while the Achilles tendon issue was further refined. Surgery before a complete diagnosis of the Achilles tendon issues could be refined and analyzed would have been premature and incomplete in assessing the source of Barrios' medical problem. A surgery on the heel spur before a full and complete diagnosis of the Achilles tendon problems would risk the possibility of two surgeries instead of one to fully address the source of the right foot pain. Surgery before assessing and diagnosing the Achilles tendon could have resulted in a surgery that did not resolve the underlying cause of Barrios' right heel pain. Conservatively treating Barrios' heel spurs while diagnosing the Achilles tendon problem before conducting surgery was

---

[3] Dr. Webster and Barrios have very different accounts of their conversation during the September 29, 2009, examination. But for the purposes of evaluating the defendants' motion, we accept Barrios' version of the facts as true. Dr. Webster testified that he did not tell Barrios that Barrios was not having a problem with the right heel bone spurs, or that Dr. Ulrich's recommendation for surgery was of no consequence to him. Dr. Webster did not tell Barrios that there would never be a surgery associated with the heel spur. The surgery was just not approved at that time. Dr. Webster was not apathetic to Barrios complaints and did not tell Barrios that "if he lived with it this long, and hadn't died yet, then it probably meant he'd live." Dr. Webster testified that he did not ignore Barrios' complaints, but instead was exploring all possible complaints and possible contributing conditions.

[4] Barrios stated in his affidavit that Dr. Webster cancelled the medication prescribed by Dr. Ulrich on September 17, 2009, and did not substitute that medication even though Barrios was complaining about the pain. This statement is disregarded because it is not based on personal knowledge.

good medical management of Barrios' problems. Bone spurs do not always require surgery and many times conservative treatment, such as anti-inflammatories and exercises, will be used to treat the problem before surgery is ordered. Dr. Ulrich testified that surgery becomes a choice after conservative treatment has failed a minimum of 6-9 months, but is generally not the first option because it takes longer than patients expect to heal from surgery and surgery does not always fully address the underlying reason the condition occurred in the first place. There are also risks associated with surgery including complications and infections that can be avoided if conservative treatment is attempted and successful in eliminating foot pain. See dkt 34-13.

Barrios presented to medical again on November 5, 2009, and Dr. Webster confirmed the same medical circumstances as were presented on September 29, 2009. Additional anti-inflammatory and pain medication was prescribed by Dr. Webster. Barrios was advised of the continuing process and continued on the Ortho Callout to assess his condition.

The proposed MRI was scheduled for November 10, 2009, but was not completed because a preliminary "scout" test indicated that Barrios had a metal fragment (a bullet) in his leg and the MRI could not be utilized.

A CT scan, as the only other diagnostic alternative, was scheduled and performed on January 14, 2010. The CT scan confirmed the bone spur and noted "sclerotic changes along the insertion of the Achilles tendon" attributed to tendonitis. The radiologist could not be more specific as to a possible tear of the Achilles tendon because of the CT scan limitations. Again, however, an MRI could not be performed because of the presence of a bullet in Barrios' leg.

On February 5, 2010, Barrios presented to sick call related to a complaint of tenderness of the left temporal region, and he requested a high top Orthopedic boot. Barrios was treated by MLP Jastillano. At that time Barrios was advised of the results of the CT scan and of the possibility of a partial tear of the Achilles tendon. MLP Jastillano recommended an orthopedic consultation to evaluate the pain at the Achilles tendon. Barrios was prescribed Ibuprofen for complaints of foot pain. A consultation with physical therapy was ordered to evaluate the necessity for an orthopedic boot. Barrios was also given Lisinopril, which he was told would help control his high blood pressure. Neither Dr. Webster nor Beighley was involved in this visit or recommended treatment.

On February 17, 2010, a physical therapist, as part of the ongoing conservative treatment and evaluation of the bone spur, and because of the x-ray evidence of tendonitis, evaluated Barrios' foot and ankle complaints. The Physical Therapist determined that Barrios would benefit from the use of a high top Orthopedic boot, and he determined that Barrios would be assisted by use of a lace up boot and a walking cane. The boots were ordered and a cane was given to Barrios. There were no physical limitations or work restrictions noted or required at the time of that evaluation. The Physical Therapist noted that since the MRI could not be performed

he could not opine about status of the Achilles tendon tear, but prescribed the high top boot to stabilize the ankle while the tendon issue was being further evaluated.

The Orthopedic boot arrived and was given to Barrios on March 31, 2010, and there were no limitations on Barrios' physical or work capabilities issued at that time. Neither Dr. Webster nor Beighley was involved in this visit or recommended treatment.

On April 12, 2010, Barrios was seen in sick call. Since the collective results of the appearance of the bullet in his leg, the alternate CT scan having been performed, and the physical therapist's evaluation were analyzed, and since conservative treatment of the heel spur pain had not resolved the heel pain, and all of the diagnostic tests that could be performed to better understand the Achilles issues were complete, a referral to an Orthopedic specialist was again recommended. Neither Dr. Webster nor Beighley was involved in this visit or recommended treatment. The URC did approve the Orthopedic consultation request.

Dr. Webster retired from the BOP on April 26, 2010, and had no personal involvement in any care administered to Barrios after that date. During the time that Dr. Webster was Clinical Director and before his retirement, appropriate conservative medical care was administered to Barrios as he presented with specific complaints. The medical records document that Dr. Webster personally examined and had an active role in Barrios' foot and ankle pain complaints on September 29, 2009, and November 5, 2009. Other than the deferral of the initial recommendation for foot surgery while further examinations were conducted, the URC, chaired by Dr. Webster, approved each recommendation for a consultation, diagnostic test, and ultimately the surgery that was performed on August 23, 2010.

On May 18, 2010, Barrios visited the medical clinic and pled with MLP Jastillano to let him see the orthopedist again because he was in excruciating pain.

On May 27, 2010, Barrios was seen by the Orthopedic specialist and his Achilles tendon issue that was originally diagnosed by Dr. Webster, and his continuing problem with the bone spur, was fully evaluated.[5] There was no rupture of the Achilles tendon, and the tendon problem was not associated with the bone spur diagnosis. Dr. Ulrich confirmed the Achilles tendon issues, recommended surgery to repair the damaged Achilles tendon and to excise the bone spur since it continued to be symptomatic and did not respond favorably to previous conservative treatment.

The recommendation for surgery was approved by the URC on June 3, 2010.

---

[5] The Orthopedic consultation that Barrios asserts was brought about by his May 18, 2010, visit to sick call to plead with Physician Assistant Jastillano, was based upon his CT scan results; the fact that an MRI could not be completed to further diagnose Plaintiff's Achilles tendon condition; use of an Orthopedic boot for assistance while ambulating; and several months of pain medications which were of varying effect, etc. EXHIBIT 4, ¶ 15, and USA 000050. The Orthopedic consultation had already been approved by the URC on April 15, 2010, and was not the result of Barrios' pleading.

The surgery was scheduled for August 23, 2010. In the interim, Barrios was appropriately followed by USP medical staff pending the scheduled surgery. Specifically, on July 1, 2010, Barrios went to sick call because he was in extreme pain, and a prescription for Indomethacin was renewed.

The surgery excising the bone spur and repairing necrotic tissue along the partially torn Achilles tendon was successfully completed on August 23, 2010. Barrios was followed post-surgery by USP medical staff. Post-surgical physical therapy was scheduled to commence on October 6, 2010, but was cancelled due to a lockdown.

On November 18, 2010, Dr. Ulrich conducted a post-surgery follow-up examination, noting that Barrios was doing extremely well. That was Dr. Ulrich's last consultation on the case.

On January 7, 2011, Barrios was given a full release from physical therapy, with notations of functional range of motion and strength. The medical records establish that medical treatment administered to Barrios regarding a bone spur, otherwise unresponsive to conservative treatment, and the Achilles tendon tear was accomplished in a single surgery after a complete and full diagnosis was obtained, which was good management of the medical issues.

Dr. Webster's course of treatment for Barrios was, in his best medical judgment, what was required to fully and completely diagnose and treat the multiple orthopedic conditions confronting Barrios. Dr. Webster did not intentionally delay Barrios' surgery in order to cause him pain. Dr. Webster and other medical care providers prescribed pain medication when requested or necessary, and Barrios' pain was appropriately managed with numerous prescriptions for various medications.

Barrios testifies that he has back pain, hypertension, headaches caused by high blood pressure, Type II diabetes, numbness in the foot and thigh, and swelling of the foot and heel. He has trouble sleeping and is restricted from running, prolonged standing and other exercises by his physical therapist. He suffers from depression, mental anguish, and a limp. Dr. Webster and Dr. Wilson each testified that based on his medical judgment, there is no medical justification for Barrios' assertions that the presence of his heel spur, or not having surgery in September of 2009 to excise the heel spur, caused the partial tear in his Achilles tendon or led to or caused hypertension, headaches, weight gain, or Type II Diabetes. These conditions typically result from other causes, including age, weight, diet and numerous other variables.

During the period of time that Barrios was complaining to the Warden and Health Administration about the deferral of his foot surgery, his complaints were not ignored and he was accurately advised by Beighley that his Achilles tendon issues were being diagnosed and tests were scheduled to assist that diagnosis.

**Analysis**

*Ms. J. Beighley.* Barrios alleges that Ms. Beighley was responsible for or participated in the decision to defer his medical treatment. The evidence, however, is that she did not have direct personal involvement in Barrios' clinical care decisions. She informed Barrios of the status of his appointments as part of her administrative responsibilities, she but did not delay Barrios' treatment, did not direct or participate in the role of the URC, and did not provide or withhold any medical care. Without evidence that Beighley was personally involved in the alleged deprivation of Barrios' right to adequate medical care, summary judgment must be granted in her favor.

*Thomas Webster, M.D.* Barrios first sought medical care in early June 2009. Dr. Webster first saw Barrios for his medical complaints in late September 2009 and played a role in the decisions and treatment of Barrios until April 26, 2010. When a physician intentionally withholds efficacious treatment, the delay may amount to deliberate indifference if the delay results in serious harm or unnecessary pain. *Johnson v. Loftin*, 2012 WL 600614, *2 (7th Cir. 2012) (citing *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010); *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009). A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain. *Arnett*, 658 F.3d at 753 (citing *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)). "[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Id.* Allegations of refusal to provide an inmate with prescribed medication or to follow the advice of a specialist can also state an Eighth Amendment claim. *Arnett*, 658 F.3d at 753 (citing *Wynn v. Southward*, 251 F.3d 588, 594 (7th Cir. 2001) (failure to respond to inmate's request for prescribed heart medication); *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999) (refusal to administer prescribed pain medication); *Jones v. Simek*, 193 F.3d 485, 490–91 (7th Cir. 1999) (failure to follow advice of specialists)).

Barrios alleges that Dr. Webster delayed surgery out of deliberate indifference to Barrios' serious medical needs. Barrios argues that since Dr. Ulrich recommended that the bone spur be surgically removed in his September 17, 2009 examination, any delay in conducting that surgery was inappropriate and constituted deliberate indifference on the part of the persons delaying the surgery. (Dkt. 23, pp.7-9). Barrios' argument is premised upon his personal conclusion that on September 17, 2009, his surgery was ordered, approved, and scheduled, and that Dr. Ulrich meant for the surgery to be performed immediately. The medical evidence, including Dr. Ulrich's testimony, dispels this conclusion.

The undisputed evidence of record establishes that Barrios had a serious medical need, but the same record establishes that his serious need was appropriately diagnosed, analyzed, treated, and repaired. Barrios has neither submitted nor identified evidence showing that Dr. Webster's course of treatment departed from accepted professional standards of care or that any medical providers withheld efficacious treatment from him. To the contrary, the record shows that Barrios' bone spur did not require immediate surgical intervention and that his

condition was properly treated. Surgery is not normally the first treatment recommended for bone spurs, as conservative treatment is generally utilized for six to nine months before surgery is considered.

Dr. Webster's personal examination of Barrios, on both September 29, 2009, and November 5, 2009, identified an Achilles tendon problem that required further diagnosis. Dr. Webster prescribed pain and anti-inflammatory medications for Barrios, in each of those encounters. Based upon observation of a ganglion cyst, the radiologist report of June 14, 2009, and Barrios' complaints of Achilles tendon pain, Dr. Webster ordered the appropriate testing to establish a firm diagnosis of the Achilles tendon issue. Dr. Webster concluded, in his medical judgment, that surgical removal of Barrios' bone spur prior to completion of a full diagnostic evaluation of the Achilles tendon issue would have been premature and would not have been appropriate. Both Dr. Ulrich and Dr. Wilson concurred that deferring the surgery while treating the bone spur conservatively until the Achilles was analyzed and diagnosed was appropriate. Dr. Webster's medical judgment proved sound, and the follow-up diagnostic work verified a partially torn Achilles tendon which was surgically repaired in a single surgical procedure.

Barrios' mere difference of opinion with the treating physicians as to what treatment was appropriate, what diagnostic tests were appropriate and feasible, and when the appropriate treatment would be rendered does not support an Eighth Amendment claim, *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."), and his self-diagnosis is insufficient to withstand the defendants' motion for summary judgment. *See Fitzgerald v. Corrections Corp. of America,* 403 F.3d 1134, 1143 (10th Cir. 2005) (prisoner's personal opinion regarding his condition or his self-diagnosis is insufficient to establish an Eighth Amendment violation); *Green v. Senkowski,* 100 Fed.Appx. 45 (2d Cir. 2004) (unpublished opinion) (finding that plaintiff's self-diagnosis without any medical evidence insufficient to defeat summary judgment on deliberate indifference claim); *Kayser v. Caspari,* 16 F.3d 280, 281 (8th Cir. 1994) (prisoner's self-diagnosis alone will not support a medical conclusion).

There is no dispute that Barrios received continual treatment of his foot and ankle pain issues, although the treatment was not in every instance the treatment he wanted, nor was treatment provided when he wanted it. The medical records establish that Barrios' heel bone spur condition was under regular observation, conservative treatment, and analysis while the Achilles tendon problem was diagnosed. During that period of conservative treatment, Barrios received pain and anti-inflammatory medications when he presented a clinical need for them.

In addition, Barrios offers no admissible evidence that the delay in performing the bone spur surgery caused him any injury. Barrios' heel pain problem was more complex than just a heel spur. The evidence establishes that the delay in performing the surgery was appropriate to permit further diagnosis of the Achilles tendon issues and that the surgical procedure ultimately performed successfully resolved both

problems. Barrios' assertions that other medical complaints were caused by or related to the delay in his heel bone surgery, are not supported by admissible evidence of record.

The undisputed evidence establishes that Barrios received proper treatment for his medical problems and there is no evidence of any deliberate indifference by Dr. Webster. Although physicians are entitled to deference in treatment decisions, deliberate indifference may be inferred when a physician's treatment decision is so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment or when his response is so inadequate that it demonstrated an absence of professional judgment. See *Arnett*, 658 F.3d at 751. Lacking any evidence that Dr. Webster's treatment was obviously inadequate, *see Berry v. Peterman*, 604 F.3d 435, 441-42 (7th Cir. 2010), or a substantial departure from standard practice, *see Gayton v. McCoy*, 593 F.3d 610, 622-23 (7th Cir. 2010), Barrios cannot make out a claim of deliberate indifference.

### Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Messerschmidt v. Millender*, 2012 WL 555206, 8 (7th Cir. February 22, 2012) (internal quotations and citations omitted).

Whether there was a constitutional violation is one component of a qualified immunity analysis. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Because in this case that inquiry shows that no constitutional violation occurred, no further analysis of the defendants' qualified immunity argument is warranted. *See Gatzimos v. Garrett*, 431 Fed. Appx. 497 (7th Cir. 2011)(citing *Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1057–58 (7th Cir. 2011)).

### Conclusion

"Federal courts must take cognizance of the valid constitutional claims of prison inmates." *Babcock v. White,* 102 F.3d 267, 275 (7th Cir. 1996) (quoting *Turner v. Safley,* 482 U.S. 78, 84 (1987)). Barrios has not identified a genuine issue of material fact as to his claim against either defendant, each of whom is entitled to judgment as a matter of law. The defendants' cross-motion for summary judgment [34] is therefore **granted**.

Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

**Date:** 03/15/2012

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana